T.C. Memo. 1999-37

UNITED STATES TAX COURT

ESTATE OF DOROTHY B. FOOTE, DECEASED, JOHN BRUMDER AND
CAROL COLLINS, PERSONAL REPRESENTATIVES, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 621-98.                    Filed February 5, 1999.

<u>James William Callison</u> and <u>Jeanne M. Coleman</u>, for
petitioner.

<u>Frederick J. Lockhart, Jr.</u> and <u>John A. Weeda</u>, for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

JACOBS, <u>Judge</u>: Respondent determined a $52,340.53 deficiency
in the Federal estate tax of the Estate of Dorothy B. Foote.
Following concessions, the sole issue for decision is the fair
market value (after application of the appropriate blockage
discount) of 280,507 shares of Applied Power, Inc. (Applied Power

or the company) class A common stock (Applied Power stock) held by Dorothy B. Foote's (decedent) revocable trust (the Trust) as of November 27, 1993, the date of decedent's death.

All section references are to the Internal Revenue Code as amended and in effect at decedent's date of death, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulations of facts are incorporated in our findings by this reference.

On the date of her death, November 27, 1993, decedent was a resident of Martin County, Florida. John Brumder and Carol Collins were duly appointed co-personal representatives of decedent's estate. Mr. Brumder resided in Boulder, Colorado, and Ms. Collins resided in Longmont, Colorado, at the time the petition in this case was filed.

The Applied Power Stock

Applied Power, incorporated in 1910, is an international manufacturing and distribution company that supplies equipment for various motion and position control applications to a variety of industries, including construction, transportation, natural resource, aerospace, and defense. Its stock is traded on the New York Stock Exchange (NYSE).

Applied Power's operations are divided into two groups:

| GROUP | PRODUCTS |
|---|---|

Distributed Products

Enerpac — Hydraulic high force tools, production automation components and accessories

GB Electrical — Electrical contractor tools as well as consumable products for electrical construction, repair, and remodeling

Engineered Solutions

Power-Packer — Hydraulic actuation systems for the transportation, medical equipment, and agricultural equipment markets

APITECH — Electrohydraulic control valves and systems for automotive and mobile equipment manufacturers

Barry Controls — Standard and customized shock, vibration, and noise solution components and systems

During 1993, Applied Power made the following announcements:

| Date | Announcement |
|------|--------------|
| Jan. 19, 1993 | Applied Power completes sale of Barry Control's Helicopter products to Lord Corporation. Net cash proceeds of $2 million. |
| Mar. 26, 1993 | Earnings report for the second quarter ended Feb. 28, 1993. Net sales up 1.2%, net income up 4.0% for the quarter. |
| June 18, 1993 | Earnings report for the third quarter ended May 31. Net sales flat, net income up 8.3% for the quarter. |
| Aug. 10, 1993 | Wright Line, Inc. (a subsidiary of Applied Power), sells its European business to Carter-Parratt, Ltd. |
| Oct. 1, 1993 | Applied Power's GB Electrical unit acquires Palmer Industries, Inc. Transaction valued at approximately $2 million. |
| Oct. 19, 1993 | Applied Power signs contract of sale for real estate at Wright Line's U.S. headquarters and manufacturing operations for $7.5 million. |
| Dec. 22, 1993 | Earnings report for year ended Aug. 31. Net sales up 0.9%, net income down 8.8% for the year. |

From August 2, 1993, to March 15, 1994, Applied Power stock traded as follows:

APPLIED POWER, INC.
NYSE Transactions--1993

| Date | High | Low | Close | Volume |
|------|------|-----|-------|--------|
| 08/02/93 | 15.75 | 15.5 | 15.625 | 2,900 |
| 08/03/93 | 15.75 | 15.75 | 15.75 | 2,000 |
| 08/04/93 | 15.875 | 15.875 | 15.875 | 15,900 |
| 08/05/93 | 16 | 15.875 | 16 | 20,100 |
| 08/06/93 | 16.125 | 16 | 16 | 3,900 |
| 08/09/93 | 16 | 16 | 16 | 7,600 |
| 08/10/93 | 16.25 | 16 | 16.125 | 700 |
| 08/11/93 | 16.125 | 16 | 16 | 20,200 |
| 08/12/93 | 16.125 | 16.125 | 16.125 | 400 |
| 08/13/93 | 16.25 | 16 | 16 | 34,200 |
| 08/16/93 | 15.875 | 15.75 | 15.75 | 3,900 |
| 08/17/93 | 16 | 15.75 | 16 | 9,400 |
| 08/18/93 | 16.25 | 16 | 16.25 | 1,700 |
| 08/19/93 | 16.25 | 16.125 | 16.25 | 6,300 |
| 08/20/93 | 16.75 | 16.5 | 16.75 | 3,500 |
| 08/23/93 | 16.875 | 16.75 | 16.75 | 2,000 |
| 08/24/93 | 17 | 16.75 | 17 | 30,400 |
| 08/25/93 | 17 | 17 | 17 | 5,000 |
| 08/26/93 | 16.875 | 16.75 | 16.75 | 5,400 |
| 08/27/93 | 16.75 | 16.75 | 16.75 | 1,200 |
| 08/30/93 | 16.75 | 16.75 | 16.75 | 1,600 |
| 08/31/93 | 17 | 16.75 | 16.875 | 7,300 |
| 09/01/93 | 17.125 | 16.875 | 17.125 | 700 |
| 09/02/93 | 17.375 | 17 | 17.25 | 50,400 |
| 09/03/93 | 17 | 16.875 | 16.875 | 1,300 |
| 09/07/93 | 17 | 16.875 | 17 | 1,700 |
| 09/08/93 | 16.875 | 16.875 | 16.875 | 4,200 |
| 09/09/93 | 17 | 16.875 | 17 | 4,900 |
| 09/10/93 | 16.875 | 16.875 | 16.875 | 2,600 |
| 09/13/93 | 16.875 | 16.875 | 16.875 | 17,400 |
| 09/14/93 | 17.125 | 16.875 | 17 | 900 |
| 09/15/93 | 17 | 17 | 17 | 300 |
| 09/16/93 | 17.125 | 17 | 17 | 3,400 |
| 09/17/93 | 17.25 | 16.875 | 17 | 2,800 |
| 09/20/93 | 17.25 | 17 | 17.125 | 7,000 |
| 09/21/93 | 17.375 | 17.25 | 17.25 | 700 |
| 09/22/93 | 17.375 | 17.25 | 17.375 | 4,500 |
| 09/24/93 | 17.75 | 17.5 | 17.75 | 8,200 |
| 09/27/93 | 18 | 17.5 | 18 | 1,500 |
| 09/28/93 | 18 | 17.875 | 18 | 6,300 |
| 09/29/93 | 18 | 18 | 18 | 900 |
| 09/30/93 | 18.125 | 17.875 | 18.125 | 4,400 |
| 10/01/93 | 18.25 | 18 | 18.25 | 800 |
| 10/04/93 | 18 | 17.75 | 17.75 | 2,200 |
| 10/05/93 | 17.625 | 17.625 | 17.625 | 900 |
| 10/07/93 | 17.5 | 17.5 | 17.5 | 2,700 |

| Date | High | Low | Close | Volume |
|------|------|-----|-------|--------|
| 10/08/93 | 17.5 | 17.5 | 17.5 | 700 |
| 10/11/93 | 17.5 | 17.5 | 17.5 | 100 |
| 10/12/93 | 17.5 | 17.5 | 17.5 | 300 |
| 10/13/93 | 17.5 | 17.5 | 17.5 | 2,700 |
| 10/14/93 | 17.875 | 17.5 | 17.875 | 26,100 |
| 10/15/93 | 17.75 | 17.75 | 17.75 | 3,600 |
| 10/18/93 | 17.75 | 17.75 | 17.75 | 100 |
| 10/19/93 | 18 | 17.75 | 18 | 3,500 |
| 10/20/93 | 17.75 | 17.625 | 17.625 | 1,400 |
| 10/21/93 | 17.625 | 17.5 | 17.5 | 800 |
| 10/22/93 | 17.5 | 17.375 | 17.5 | 700 |
| 10/25/93 | 17.5 | 17.375 | 17.375 | 6,800 |
| 10/26/93 | 17.5 | 17.375 | 17.375 | 34,600 |
| 10/27/93 | 17.25 | 16.875 | 16.875 | 6,500 |
| 11/01/93 | 16.875 | 16.5 | 16.5 | 19,400 |
| 11/02/93 | 16.5 | 16.375 | 16.375 | 7,100 |
| 11/03/93 | 16.25 | 16 | 16 | 6,200 |
| 11/04/93 | 15.875 | 15.75 | 15.875 | 1,200 |
| 11/05/93 | 15.625 | 15.625 | 15.625 | 1,100 |
| 11/08/93 | 15.875 | 15.75 | 15.75 | 5,300 |
| 11/09/93 | 15.75 | 15.5 | 15.5 | 10,400 |
| 11/10/93 | 15.625 | 15.5 | 15.5 | 800 |
| 11/11/93 | 15.375 | 15.375 | 15.375 | 300 |
| 11/12/93 | 15.5 | 15.375 | 15.5 | 11,100 |
| 11/15/93 | 15.375 | 15.125 | 15.25 | 4,200 |
| 11/16/93 | 15 | 14.75 | 14.75 | 18,600 |
| 11/17/93 | 14.75 | 14.5 | 14.5 | 15,100 |
| 11/18/93 | 15.125 | 14.75 | 14.875 | 9,100 |
| 11/19/93 | 15.125 | 14.75 | 15.125 | 8,300 |
| 11/22/93 | 15.25 | 14.875 | 15.25 | 11,800 |
| 11/23/93 | 15.375 | 15 | 15.125 | 77,000 |
| 11/24/93 | 15 | 15 | 15 | 800 |
| 11/29/93 | 15.25 | 15 | 15 | 15,900 |
| 11/30/93 | 15.375 | 15 | 15 | 6,400 |
| 12/01/93 | 15.125 | 14.625 | 14.625 | 52,100 |
| 12/02/93 | 14.875 | 14.625 | 14.75 | 2,800 |
| 12/03/93 | 15 | 14.875 | 15 | 13,700 |
| 12/06/93 | 15.125 | 15 | 15 | 6,500 |
| 12/07/93 | 15 | 15 | 15 | 300 |
| 12/08/93 | 15.625 | 15.25 | 15.625 | 4,600 |
| 12/09/93 | 15.625 | 15.5 | 15.625 | 2,000 |
| 12/10/93 | 15.75 | 15.5 | 15.625 | 2,100 |
| 12/13/93 | 15.875 | 15.875 | 15.875 | 600 |
| 12/14/93 | 15.875 | 15.75 | 15.75 | 2,100 |
| 12/15/93 | 15.75 | 15.625 | 15.625 | 3,000 |
| 12/16/93 | 16 | 15.625 | 16 | 10,200 |
| 12/17/93 | 16.5 | 16.25 | 16.5 | 5,000 |
| 12/20/93 | 16.625 | 16.25 | 16.625 | 18,400 |
| 12/21/93 | 16.5 | 16.5 | 16.5 | 400 |

| Date | High | Low | Close | Volume |
|------|------|-----|-------|--------|
| 12/22/93 | 16.25 | 15.625 | 15.625 | 23,700 |
| 12/23/93 | 15.75 | 15.5 | 15.75 | 3,100 |
| 12/27/93 | 16.25 | 16 | 16.125 | 1,500 |
| 12/28/93 | 16.5 | 16 | 16.5 | 15,900 |
| 12/29/93 | 16.5 | 16.125 | 16.5 | 2,900 |
| 12/30/93 | 16.25 | 16.25 | 16.25 | 1,000 |
| 12/31/93 | 16.25 | 16.25 | 16.25 | 900 |

APPLIED POWER, INC.
NYSE Transactions--1994

| Date | High | Low | Close | Volume |
|------|------|-----|-------|--------|
| 01/03/94 | 16.5 | 16.25 | 16.25 | 10,000 |
| 01/04/94 | 16.5 | 16.5 | 16.5 | 600 |
| 01/05/94 | 16.625 | 16.375 | 16.625 | 2,500 |
| 01/06/94 | 16.5 | 16.5 | 16.5 | 1,700 |
| 01/07/94 | 17 | 16.375 | 17 | 7,400 |
| 01/10/94 | 16.75 | 16.625 | 16.625 | 500 |
| 01/11/94 | 17.375 | 16.875 | 17.375 | 16,200 |
| 01/12/94 | 17.5 | 17.375 | 17.375 | 9,800 |
| 01/13/94 | 17.625 | 17.25 | 17.375 | 10,200 |
| 01/14/94 | 17.375 | 17.25 | 17.25 | 1,500 |
| 01/17/94 | 17.25 | 17.25 | 17.25 | 1,000 |
| 01/18/94 | 17.25 | 17.25 | 17.25 | 8,100 |
| 01/19/94 | 18.125 | 17.25 | 18.125 | 8,600 |
| 01/20/94 | 18.375 | 18.125 | 18.25 | 5,500 |
| 01/21/94 | 18.25 | 18.25 | 18.25 | 12,700 |
| 01/24/94 | 18.25 | 18.25 | 18.25 | 2,900 |
| 01/25/94 | 18.25 | 18.25 | 18.25 | 10,700 |
| 01/26/94 | 18.5 | 18.375 | 18.375 | 6,000 |
| 01/27/94 | 18.375 | 18.25 | 18.375 | 1,900 |
| 01/28/94 | 18.625 | 18.5 | 18.5 | 83,000 |
| 01/31/94 | 18.875 | 18.625 | 18.875 | 14,100 |
| 02/01/94 | 18.625 | 18.375 | 18.625 | 12,800 |
| 02/02/94 | 18.5 | 18.375 | 18.375 | 13,900 |
| 02/03/94 | 18.625 | 18.25 | 18.625 | 5,100 |
| 02/04/94 | 18.375 | 18 | 18.375 | 16,900 |
| 02/07/94 | 18.125 | 18 | 18.125 | 9,200 |
| 02/08/94 | 18.125 | 18.125 | 18.125 | 400 |
| 02/09/94 | 18.5 | 18.375 | 18.5 | 1,400 |
| 02/10/94 | 18.75 | 18.625 | 18.625 | 14,600 |
| 02/11/94 | 18.5 | 18.5 | 18.5 | 2,100 |
| 02/14/94 | 18.875 | 18.375 | 18.75 | 83,200 |
| 02/15/94 | 18.625 | 18.625 | 18.625 | 2,300 |
| 02/16/94 | 19.125 | 18.5 | 19.125 | 26,700 |
| 02/17/94 | 19.25 | 19 | 19.125 | 256,400 |
| 02/18/94 | 19.375 | 19 | 19.125 | 4,900 |

| Date | High | Low | Close | Volume |
|------|------|-----|-------|--------|
| 02/22/94 | 19.375 | 19.125 | 19.125 | 40,800 |
| 02/23/94 | 19 | 19 | 19 | 400 |
| 02/24/94 | 19.125 | 18.875 | 18.875 | 11,200 |
| 02/25/94 | 18.875 | 18.375 | 18.375 | 6,700 |
| 02/28/94 | 18.625 | 18.375 | 18.625 | 600 |
| 03/01/94 | 18.5 | 18.25 | 18.375 | 2,700 |
| 03/02/94 | 18.125 | 17.625 | 17.625 | 3,500 |
| 03/03/94 | 17.5 | 17 | 17 | 3,800 |
| 03/04/94 | 16.875 | 16.375 | 16.5 | 10,600 |
| 03/07/94 | 17.5 | 16.75 | 17.5 | 14,600 |
| 03/08/94 | 18 | 18 | 18 | 4,900 |
| 03/09/94 | 18 | 17.75 | 18 | 5,500 |
| 03/10/94 | 18.375 | 18.125 | 18.25 | 2,300 |
| 03/11/94 | 19.875 | 18.75 | 19.625 | 75,700 |
| 03/14/94 | 19.875 | 19.25 | 19.75 | 129,100 |
| 03/15/94 | 20 | 19.75 | 19.875 | 59,900 |

At the date of decedent's death (November 27, 1993), the Trust held, among other assets, 280,507 shares of Applied Power common stock, constituting approximately 2.2 percent of that class of outstanding stock (13,013,116 shares).

Shares of Applied Power stock did not trade on the date of decedent's death. The average of the mean trading prices of Applied Power stock for the last trading day preceding decedent's death, November 24, 1993, and for the first trading day following decedent's death, November 29, 1993, was $15.125 per share. Thus, based on a valuation of $15.125 per share, the value of the 280,507 shares of stock in issue was $4,242,668, before any blockage discount.

Research Reports

Robert W. Baird & Co., Inc. (Baird), an investment banking firm located in Milwaukee, Wisconsin, followed Applied Power. On April 2, 1993, Baird issued a research note (the Baird April

report) which stated that after 18 months of restructuring[1] Applied Power was "poised to benefit from an economic recovery in its end markets" but that "difficult European and Asian markets will likely keep a lid on stock performance until fiscal 1994." In its April report, Baird rated the stock of Applied Power (on a scale of 1 to 4) as a "Hold-3, higher risk", meaning a recommendation to hold the stock.

On June 18, 1993, Baird issued another research note (the Baird June report) on Applied Power. Baird maintained its Hold-3 rating for Applied Power's stock, but the report noted that Applied Power's third quarter earnings would exceed Baird's prior estimate. The report also discussed positive developments for several of the Applied Power operating divisions. Although cautious with respect to earnings for the remainder of fiscal 1993 and for the first half of fiscal 1994, the Baird June report projected that Applied Power would have significant operating leverage and sharply higher earnings once its European sales grew.

Standard & Poor's Corp. issued an October 20, 1993, stock report on Applied Power, giving the stock a B+ ranking. This report noted Applied Power's increased earnings for the first 9 months of 1993, despite a weakness in worldwide economies. The

---

[1] The Baird April report listed four categories of positive restructuring moves made by Applied Power during the previous 18 months: Staffing reductions; consolidation of marketing and management; discontinuance of a relatively unproductive business product line; and the strengthening of senior management.

report also noted slightly increased sales for the first 9 months of Applied Power's 1993 fiscal year and higher pretax income.

On November 19, 1993, Baird issued another research note on Applied Power (the Baird November report), captioned "Story Improving, But Earnings Aren't".  This report gave a rating of "Hold-3, higher risk" (again, a recommendation to hold the stock) for the Applied Power stock.[2]  The Baird November report stated "Positive Developments Are Emerging" and cited six points as "good news" to support a belief that "Applied Power will see its day."

On January 4, 1994, Baird issued yet another research note (the Baird January report) for Applied Power, raising Applied Power's stock's rating to a "Buy-2" rating.

---

[2]     The research note stated in pertinent part:

current business trends are still weak, not yet suggesting annual top-line growth of even 2-3%.  Given that the first quarter will most likely fall short of consensus estimates of $0.25-$0.26 and the lack of visibility as to any meaningful recovery, we are reducing our fiscal year 1994 earnings estimate to $1.15 and maintaining our Hold-3 rating.

\*     \*     \*     \*     \*     \*     \*

Quite simply, Applied Power will not recover until Europe and Japan improve, and Aerospace markets at least stabilize.  Applied Power is hoping for stability in Europe and Japan by the end of this year, but sees substantial recovery postponed until the 1995-96 period.  Thus, Applied Power, while not extremely expensive, is not a compelling value.  While the time to buy Applied Power will occur before these recoveries actually begin, it remains too early.

Financial Review

The portion captioned "Management's Discussion and Analysis of Results of Operations and Financial Condition" of Applied Power's Form 10-Q (filed with the Securities and Exchange Commission) for the quarter ended November 30, 1993, states:

> RESULTS OF CONTINUING OPERATIONS (Dollars are in thousands except for per share amounts)
>
> Net earnings for the first quarter were $2,580, or $0.20 per share, compared to a loss of $1,048, or $0.08 per share in the prior year, which included a $4,355 charge for the cumulative effect of adopting a new accounting pronouncement for postretirement benefits. Earnings before accounting changes for the first quarter of fiscal 1994 were $2,580, or $0.20 per share, compared to $3,307, or $.25 per share, for the same period last year.
>
> Sales for the first quarter of fiscal 1994 were $91,097, down slightly from $91,721 reported in the same quarter last year. Due to poor economic conditions, results at the Company's operations in Europe and Japan were weak, with sales declines from last year of 11% and 2%, respectively. Sales in North America increased 4% over last year.
>
> Sales increases were recorded at GB Electrical, Power-Packer, and APITECH of 15%, 8% and 100%, respectively. Due to poor economic conditions in Europe and Japan, Enerpac sales declined 7% from last year. First quarter sales at Barry Controls were lower than the comparable period last year due to reduced demand from aircraft manufacturers, as well as the sale of the helicopter product line in the second quarter of fiscal 1993.
>
> The Company's overall gross profit margin declined from 37.8% in the first quarter of fiscal 1993 to 37.2% in the most recent quarter, reflecting an unfavorable shift in product mix.

Operating expenses for the first quarter of fiscal 1994 were approximately equal with those in the comparable period last year. Increased engineering costs related to product development and prototypes at Barry Controls and Power-Packer were offset by operating efficiencies realized as a result of fiscal 1993 restructuring of Barry Controls.

Interest expense declined from the first quarter of fiscal 1993 due to reductions in outstanding indebtedness and lower market interest rates.

Other-net operating expenses in fiscal 1993 included certain non-recurring gains.

A $4,355 net charge was recorded in the quarter ended November 30, 1992 to reflect the Company's adoption of SFAS No. 106 - "Employers' Accounting for Postretirement Benefits Other Than Pensions".

LIQUIDITY AND CAPITAL RESOURCES

Cash and cash equivalents totaled $1,546 at November 30, 1993 and $939 at August 31, 1993. In order to minimize interest expense, the Company intentionally maintains low cash balances and uses available cash to reduce short-term bank borrowings.

After considering non-cash items and changes in operating assets and liabilities, the Company generated $2,979 of cash in operating activities in the first three months of fiscal 1994, compared with $(43) in the comparable prior year period. Earnings of $2,580, coupled with non-cash items of $4,014, generated $6,594 of cash in the most recent quarter. However, income tax payments partially offset this cash generation.

The Company used $3,771 of cash in investing activities in the first quarter of fiscal 1994, the majority of which was utilized for capital expenditures and the acquisition of Palmer Industries.

Debt was reduced from $117,931 at August 31, 1993 to $112,422 at November 30, 1993,

primarily reflecting the application of the Datafile sale proceeds against outstanding indebtedness.

The Company's revolving credit agreements expire within the next twelve months. Accordingly, all outstanding indebtedness under such agreements has been included in "Current maturities of long-term debt" in the Condensed Consolidated Balance Sheet. The Company anticipates either extending these agreements or entering into new facilities prior to their expiration.

The Company anticipates that funds generated from operations and available under short and long-term credit facilities will be adequate to meet anticipated requirements for the foreseeable future.

Postdeath Events

At the beginning of calendar year 1994, Bank One Wisconsin Trust Co. (Bank One) was requested to explore the possibility of selling one or more blocks of the Applied Power stock held by the Trust to one or more investors (as had been discussed by the trustees at a December 1993 meeting), and to propose a plan for selling any remaining shares on the open market in a manner that would have a minimal adverse pricing effect.

On February 17, 1994, Bank One, on behalf of the Trust, sold 200,000 shares of the Trust's block of Applied Power stock at a price of $19 per share. The shares were sold through Cantor Fitzgerald & Co. in one or more negotiated trade or trades. The transaction results were reported on the NYSE. (The reported NYSE high and low trading quotes for Applied Power on February 17, 1994, were $19.25 per share and $19 per share, respectively.)

On February 22, 1994, Bank One, on behalf of the Trust, sold an additional 40,000 shares of the Trust's block of Applied Power stock at $19.25 per share through Jefferies & Co., Inc. (Jefferies), in one or more negotiated trade or trades. The transaction results were reported on the NYSE. (The reported NYSE high and low trading quotes for Applied Power on February 22, 1994, were $19.375 per share and $19.125 per share, respectively.)

On March 11, 1994, Bank One, on behalf of the Trust, sold the balance of the Trust's block of stock (40,507 shares) at $19.50 per share through Jefferies, in one or more negotiated trade or trades. The transaction results were reported on the NYSE. (The reported NYSE high and low trading quotes for Applied Power on March 11, 1994, were $19.875 per share and $18.75 per share, respectively.[3])

Estate Tax Return, Notice of Deficiency, and Petition

On Schedule G of its estate tax return (filed November 8, 1994), petitioner valued the 280,507 Applied Power shares in question as of decedent's date of death at $4,020,600.24, or $14.333 per share, claiming a blockage discount of $0.792 per

---

[3] The table below summarizes the Trust's 1994 sales of its Applied Power shares:

| Trade Date | Total Volume | Applied Shares Sold | Price Per Share | High | Low | Close | Previous Day Close |
|---|---|---|---|---|---|---|---|
| 2/17 | 256,400 | 200,000 | $19.000 | $19.250 | $19.000 | $19.125 | $19.125 |
| 2/22 | 40,800 | 40,000 | 19.250 | 19.375 | 19.125 | 19.125 | 19.125 |
| 3/11 | 76,200 | 40,507 | 19.500 | 19.875 | 18.750 | 19.625 | 18.250 |

share[4] (representing a 5.24-percent discount from the mean between the highest and lowest quoted selling prices). Neither an appraisal nor supporting documentation was attached to the estate tax return to support the selected blockage discount.

In connection with an Internal Revenue Service (IRS) examination of petitioner's tax return, the estate submitted to the IRS a January 24, 1996, appraisal prepared by Baird's John D. Emory (the Emory report) which concluded that an 8-percent blockage discount was appropriate (or a fair market value for the stock of $13.915 per share).

The estate also submitted an appraisal report prepared on July 7, 1997, by Robert E. Kleeman, Jr., of Clifton Gunderson, L.L.C., a certified public accounting and consulting firm (the July 1997 Kleeman report), which concluded that a 22.5-percent discount was appropriate (or a fair market value for the stock of $11.72 per share). Mr. Kleeman arrived at this conclusion, in part, by selecting 18 reported blockage discount Tax Court cases which he determined to be "factually similar to the matter under discussion". The discounts in the selected cases ranged from 8.1 percent to 52.9 percent. The average or mean discount was 26 percent, and the median discount was 19 percent. Mr. Kleeman averaged the mean and median discount to arrive at the 22.5-percent discount. (In obtaining the average discount, Mr. Kleeman equally weighted the discount allowed in each of his selected cases. In

---

[4] The return stated the discount to be 75 cents per share.

obtaining the median discount, he selected a value such that half the discounts in his selected cases fell above that value and half below.)

In the notice of deficiency mailed on October 15, 1997, respondent determined, in pertinent part, that the reported value of the Applied Power stock owned by the Trust was understated. Respondent determined that the blockage discount should be $0.125 per share (representing a 0.83-percent discount from the mean between the highest and lowest quoted selling prices applicable to the date of death) rather than $0.792 per share as claimed by the estate on the return.

On October 29, 1997, the estate's co-personal representatives filed an amended estate tax return requesting a refund (on Form 843) of $352,799.99, in light of the Emory and July 1997 Kleeman reports. The personal representatives determined that the fair market value for the 280,507 shares in issue was $3,288,000, based on an $11.72 per-share valuation. In reaching this valuation, the personal representatives determined that a $3.405 per-share blockage discount (representing a 22.5-percent discount from the mean between the highest and lowest quoted selling prices applicable to the date of death) was appropriate. The July 1997 Kleeman report was attached to the amended return in order to substantiate the estate's position.

## ULTIMATE FINDING OF FACT

The value of the Trust's 280,507 shares of common stock on the valuation date was $4,102,414.88, or $14.625 per share. This

conclusion is based upon the stock's having a per-share date-of-death fair market value of $15.125, before application of a 50-cent-per-share (or a 3.3-percent) blockage discount.

OPINION

The fundamental issue involved herein concerns the appropriate blockage discount, if any, to be used in valuing the 280,507 shares at issue on the date of decedent's death. Petitioner maintains that a 22.5-percent blockage discount is in order, whereas respondent contends (in the Answer to the petition and in respondent's posttrial brief) that no blockage discount is appropriate, but if one is, then the amount of the discount should not exceed 3.3 percent.

We begin our task by reiterating several well-established and often-stated principles. First, in valuing property for estate tax purposes the standard for valuation is fair market value, which is defined as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright, 411 U.S. 546, 551 (1973); Collins v. Commissioner, 3 F.3d 625, 633 (2d Cir. 1993), affg. T.C. Memo. 1992-478; sec. 20.2031-1(b), Estate Tax Regs. Second, where shares of stock are the property being valued, we look to whether the stock is publicly traded. If it is, then: (1) The price at which the stock is sold on a stock exchange or on the over-the-counter market generally is the best evidence of the stock's value, Dellacroce v. Commissioner, 83 T.C. 269, 288

(1984); <u>Estate of Damon v. Commissioner</u>, 49 T.C. 108, 115 (1967); sec. 20.2031-2(b)(1), Estate Tax Regs.; and (2) the stock's fair market value is the mean between the highest and lowest quoted selling prices on the valuation date, sec. 20.2031-2(b), Estate Tax Regs.  However, if as here no sales occurred <u>on</u> the valuation date, fair market value is determined by taking a weighted average of the means between the highest and lowest sales on the nearest dates before and after the valuation date.  Sec. 20.2031-2(b), Estate Tax Regs. (Here, the parties have stipulated that the weighted average mean per-share market price of the stock being valued is $15.125.) Third, where a block of stock could not have been sold on the valuation date (or within a reasonable period[5] thereafter) without affecting market price, a "blockage" discount is appropriate. <u>Richardson v. Commissioner</u>, 151 F.2d 102, 103 (2d Cir. 1945), affg. a Memorandum Opinion of this Court.  In this regard, section 20.2031-2(e), Estate Tax Regs., provides in pertinent part:

---

[5] Determining a reasonable period of time "depends on all the facts and circumstances". <u>Estate of Sawade v. Commissioner</u>, T.C. Memo. 1984-626, affd. 795 F.2d 45 (8th Cir. 1986).  Periods of up to a year have been found to be reasonable, <u>id.</u>, although the periods may be much shorter if factors such as market volatility and time limitations so dictate, see, e.g., <u>Du Pont v. Commissioner</u>, 2 T.C. 246 (1943); <u>Estate of Sawade v. Commissioner</u>, <u>supra</u>.

> In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued.  If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations. * * *

This regulation further states that complete data and support of any blockage discount must be submitted with a taxpayer's return.

There is no presumption of blockage.  Maytag v. Commissioner, 187 F.2d 962 (10th Cir. 1951), affg. a Memorandum Opinion of this Court.  Petitioner bears the burden of proof in this regard. Rushton v. Commissioner, 498 F.2d 88, 94 (5th Cir. 1974), affg. 60 T.C. 272 (1973); Maytag v. Commissioner, supra. "Blockage is not a rule of law, but a question of fact.  If the price obtainable for a block of stock is influenced by the size of the block, the existence and extent of this influence must be proven." Estate of Christie v. Commissioner, T.C. Memo. 1974-95; see Estate of Damon v. Commissioner, supra at 117.  Several factors are helpful in determining the size of an appropriate blockage discount:  The mean market quotation for the security on the valuation date, the size of the block in relation to the total outstanding stock, the trading activity in the stock on or near the valuation date, the depth and trend of the market for the security, and the market

depth and trend as a whole (measured at and after the valuation date).  See, e.g., <u>Estate of Christie v. Commissioner</u>, <u>supra</u>.

With the foregoing in mind, the stage is now set for our consideration of the expert opinions offered by each of the parties in support of their respective positions as to the blockage discount to be herein applied.

<u>Petitioner's Expert</u>

Mr. Kleeman (the individual who wrote a July 1997 report discussed <u>supra</u> p. 15) was petitioner's expert witness.  He has an undergraduate degree in accounting, is a licensed certified public accountant, and heads the business valuation practice of the accounting firm of Clifton Gunderson, L.L.C.  At the time of trial, he held three business valuation designations (one each from the American Institute of Certified Public Accountants, the American Society of Appraisers, and the National Association of Certified Valuation Analysts).

Practically all of the 60 to 80 business valuation assignments Mr. Kleeman prepares or reviews every year consist of valuations concerning closely held companies. In addition to the work he performed for petitioner, Mr. Kleeman participated in a few other assignments involving the application of the blockage discount in determining the value of publicly traded stock.

Mr. Kleeman prepared his September 1998 report for purposes of this trial.  He therein concluded that a 22.5-percent blockage discount was appropriate in valuing the stock at issue, resulting in a valuation of $11.72 per share or total of $3,288,000 for all

the stock at issue. In preparing his September 1998 report, Mr. Kleeman relied on public information available before the date of decedent's death, such as the April, June, and November Baird reports, the Form 10-Q filed by Applied Power with the Securities and Exchange Commission for the quarter ended November 30, 1993, the trading prices and volumes of Applied Power's stock, and the relative size of the Trust's block of stock to the total issued and outstanding stock of Applied Power. In preparing his report, Mr. Kleeman also considered the Emory report, the post-date-of-death sales of the block at issue, and a select group of reported blockage discount cases.

Mr. Kleeman prepared a linear regression analysis of the stock's trading volume and prices leading up to the valuation date in order to forecast how the Trust might best sell its stock without seriously depressing the market. He concluded that the Trust could not dispose of its block of stock over a reasonable period of time without depressing the stock's market price. He assumed that disposal of the 280,507 shares of stock would have to occur over a period of 40 days, in 7,000-share-per-day increments (i.e., twice the average daily trading volumes for November and December 1993), and that these sales would result in a price decline of approximately 9 cents per day. Using these assumptions, he determined that the present value of proceeds from the transactions would be approximately $3,288,000, or $11.72 per share.

Respondent's Expert

Respondent's expert, Richard L. Davis, a chartered financial analyst, is the managing director and senior vice president of the corporate finance department of Southwest Securities, Inc., an investment banking firm[6] and a member of the NYSE. Mr. Davis has a master's degree in business administration, concentrating in finance. The majority of Mr. Davis' assignments over the years have involved securities of publicly traded companies or publicly traded issues of privately held or previously privately held companies.

Mr. Davis opined that a 3.3-percent blockage discount is appropriate. When applied to the agreed $15.125 per-share price (the weighted average mean per-share market price of the stock), the 3.3-percent blockage discount results in a $14.625 per-share valuation or a $4,102,414.88 total value.

Mr. Davis determined that market activity in the Applied Power stock on or about the valuation date was free from abnormal factors and influences; thus, he concluded that the trading prices for Applied Power's stock were representative of the stock's fair market value. Mr. Davis felt that this conclusion was buttressed by the fact that ultimately most of the Trust's Applied Power stock

---

[6] As an investment banker (with over 21 years experience), Mr. Davis' work is primarily performed in three areas: (1) Raising capital through public offerings and private placements; (2) representing buyers and sellers of companies in mergers and acquisitions; and (3) providing financial advisory services, valuations, and expert testimony in investment banking transactions.

(240,000 of the 280,507 shares) was sold within 90 days of the date of decedent's death at prices which did not depress the previous day's trading price for the stock.  He further found support for his 3.3-percent blockage discount conclusion in the fact that all the shares were sold within approximately 110 days after the date of decedent's death at prices somewhat higher than the price before decedent's death.

Mr. Davis considered the following factors in arriving at his conclusion:  (1) The shares at issue represented 2.2 percent of the total shares outstanding; (2) relative to Applied Power's daily trading volume, the size of the Trust's block represented the number of Applied Power's shares traded during an average 29-day period during 1993; (3) there were no resale restrictions on the block; (4) there was moderate volatility with a flat or stable stock price trend; (5) the size of the trading "float" of the stock (90 percent of the shares outstanding); (6) the general stock market trend (which was stable to moderately rising) in 1993; (7) the stock in issue traded on NYSE; (8) the most recent projected earnings trend of the company (which was moderately upward); (9) the market price performance of the stock vis-a-vis the general stock market; (10) Applied Power's dividend-paying record; (11) the current outlook for the company; (12) U.S. economic trends; (13) the number of Applied Power shareholders (558 as of October 31, 1993), including institutions (30); (14) the percentage (60 percent) of institutional ownership of the shares of Applied Power; and (15) the stock was a marginable security.

In determining the blockage discount to be accorded to the Trust's stock, Mr. Davis tabulated statistics involving 8 days in 1993 where more than 50,000 shares of Applied Power stock were traded,[7] comparing the closing price on each of those days with the previous day's close, and noting that the largest down tick trading day was 2.5 percent while for one of the largest trading volume days there was an up tick of 1.5 percent.

Mr. Davis stated that taken together, the following factors substantiate his conclusion: (1) The close proximity of the sale of all of the Trust's stock (within 3-1/2 months of the valuation date); (2) the number of days (only 3) taken to accomplish the disposal of all of the Trust's stock; and (3) the apparent ease of the sale of all the Trust's stock and lack of disruption in the market price of Applied Power stock.

---

[7]   The following table demonstrates the market "acceptability" on each of the 8 days during 1993 on which more than 50,000 shares of Applied Power common stock were traded:

| Date | Volume | High | Low | Close | Previous Day Close | Price Dollar Change | Price Percent Change |
|------|--------|------|-----|-------|-------------------|--------------------|--------------------|
| 2/25 | 62,600 | $17.750 | $17.500 | $17.625 | $17.875 | ($0.250) | -1.4% |
| 3/11 | 56,600 | 17.625 | 17.375 | 17.500 | 17.375 | 0.125 | 0.7 |
| 4/08 | 57,300 | 17.750 | 17.500 | 17.625 | 17.625 | --- | 0.0 |
| 5/04 | 99,400 | 17.250 | 16.750 | 17.250 | 17.000 | 0.250 | 1.5 |
| 5/12 | 104,000 | 16.875 | 16.625 | 16.625 | 16.875 | (0.250) | -1.5 |
| 9/02 | 50,400 | 17.375 | 17.000 | 17.250 | 17.125 | 0.125 | 0.7 |
| 11/23 | 77,000 | 15.375 | 15.000 | 15.125 | 15.250 | (0.125) | -0.8 |
| 12/01 | 52,100 | 15.125 | 14.625 | 14.625 | 15.000 | (0.375) | -2.5 |

Concluding, Mr. Davis opined that the sale of the Trust's block of Applied Power stock, when added to the supply of shares regularly coming on the market at the time of decedent's death, would have only a moderately depressing effect on the normal pricing of the shares, making appropriate a 3.3-percent blockage discount.

Rebuttals

Mr. Kleeman believed that Mr. Davis' 3.3-percent blockage discount conclusion is based virtually exclusively on information that became available (and events that occurred) after the valuation date and that such postdate information and events were not foreseeable as of the valuation date. In Mr. Kleeman's opinion, the economic conditions leading to the Trust's 1994 sales were significantly different than the conditions existing as of the date of decedent's death, and were not reasonably foreseeable at that time (i.e., the upgrading of its rating of Applied Power stock from a "Hold-3" to a "Buy-2" rating by Baird in January 1994. Further, Mr. Kleeman noted that 8 days before decedent's death, Baird had rated Applied Power stock as a "higher risk".)

Respondent counters Mr. Kleeman's criticism by pointing to Mr. Kleeman's own September 1998 report and testimony, which according to respondent show that Mr. Kleeman arrived at his 22.5-percent discount figure by performing a price trend analysis for the Applied Power stock and projecting that trend forward to a post-date-of-death absorption period. Respondent further asserts that in preparing his "regression analysis", Mr. Kleeman made several

erroneous assumptions (i.e., the Applied Power stock would not be absorbed by the market at a volume greater than twice the stock's average daily trading volume for the months of November and December 1993, and the price trend for the Applied Power stock for the 40 trading days preceding the valuation date should be projected forward to the 40 trading days following the valuation date).

Respondent complains that to a large extent, Mr. Kleeman's calculation of a 22.5-percent blockage discount was determined by using 18 selected blockage discount tax cases. We also find fault with this approach. Each case is different, and the determination of a blockage discount, if any, depends upon the particular facts and circumstances involved. In obtaining the average discount from these cases, Mr. Kleeman weighted the discount allowed in each equally; and in obtaining the median discount for the stock of Applied Power, he selected a value such that half the discounts in his selected cases fell above that value and half below.

Responding to Mr. Kleeman's criticism of his report, Mr. Davis maintained that he (Mr. Davis) arrived at a 3.3-percent blockage discount primarily by considering events occurring before the date of death. Moreover, Mr. Davis maintained that he did not arrive at his blockage discount conclusion by considering post-valuation date sales, but rather used those sales to substantiate his conclusion.

Court's Analysis and Conclusion

Giving due consideration to the totality of the evidence before us, we find Mr. Davis' report to be more reliable than that

of Mr. Kleeman.  We agree with, and therefore accept, Mr. Davis' analysis.  We do so for the following reasons:

First, Mr. Davis properly considered the relevant factors: (1) The relative size of the Trust's block of stock in relationship to the number of shares of stock outstanding, (2) the ownership of other blocks of stock, (3) current and historical trading volumes of shares of Applied Power stock, and (4) recent company-specific events.  Mr. Davis also reviewed general economic conditions and securities market trends and sentiment.

Second, in determining the size of the blockage discount to be applied, Mr. Davis tabulated information relating to eight 50,000-share-plus-trading days of Applied Power common stock in 1993, comparing the stock's closing price on each of those days with its previous day's closing price, and noted that the largest down tick trading day was 2.5 percent, whereas on one of the largest trading volume days there was an up tick of 1.5 percent.  On the basis of this comparison, Mr. Davis concluded that only a modest blockage discount would be appropriate.

We are mindful that as a general rule only facts known at the valuation date are considered in determining the property's value. However, subsequent market activities may provide helpful comparable sales.  See Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 n.15 (1990).  Here, we believe the three sales by the Trust within 3-1/2 months of decedent's death to be relevant and reasonably proximate to the valuation date.  This 3-1/2-month

period was, in our opinion, a reasonable period of time following the valuation date.

Petitioner failed to show that the market price of the stock on the valuation date was an inaccurate reflection of the true value of the Trust's block of stock. The relative size of the block of stock at issue in relation to the amount of Applied Power stock outstanding, plus the monthly and yearly trading volumes for the stock of Applied Power, plus the fact that the entire block of stock was sold within an acceptable period of time after the valuation date (and on 3 trading days) suggest that only a minimal blockage discount is warranted. In our opinion, the depressing effect on the market of the Trust's sale of its stock is not commensurate with the 22.5-percent blockage discount estimate of Mr. Kleeman.

To summarize, we conclude that a 50-cent-per-share or 3.3-percent blockage discount (as advocated by Mr. Davis) is warranted herein. Thus, the value of petitioner's 280,507 Applied Power common stock on the valuation date was $4,102,414.88, or $14.625 per share.

To reflect concessions and to permit petitioner to claim additional administrative expenses pursuant to section 2053,

Decision will be entered under Rule 155.